IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARGARET TOURTELLOTTE, et al., Plaintiffs, | : : : |
| v. | : CIVIL ACTION : |
| ELI LILLY AND COMPANY, et al., Defendants. | : NO. 09-0774 : : : |

## OPINION

Presently before the Court is Defendant Eli Lilly's Renewed Motion for Summary Judgment as to all claims by Plaintiff Ashley C. Hiser (Doc. 96); Plaintiff Ashley C. Hiser's Response in Opposition thereto (Doc. 105); and Defendant Eli Lilly's Reply in Support of its Renewed Motion for Summary Judgment (Doc. 112). Upon consideration of the parties' motions with briefs, and for the reasons set forth below, Defendant's motion will be granted.

I.  FACTUAL BACKGROUND

Plaintiff Ashley Hiser ("Hiser") was hired by Defendant Eli Lilly ("Defendant" or "Lilly") in February 2006 as a sales representative. Hiser worked primarily out of her home and was responsible for promoting Defendant's products in the Philadelphia territory. From the start of her employment until the end of 2006, Hiser reported to Chris Hudson ("Hudson"). After several months on the job, Hiser received an informal mid-year review from Mr. Hudson in which he provided positive feedback on her leadership and communication skills. Hiser later received a merit based pay increase based on her performance.

In January 2007, Tim Rowland ("Rowland") replaced Mr. Hudson as Hiser's

1

supervisor. During Rowland's introductory meeting with the sales team, Hiser claims that she became suspicious of some of his behavior, specifically his mentions of enjoying women's company, referring to female employees as "Barbie Dolls," preferring hugs over handshakes, and his impersonation of a homosexual individual by talking in a lisp and using certain hand gestures. In the same month, Hiser met with Rowland individually to discuss her merit pay increase for her 2006 performance. Hiser claims that Rowland told her that the increase was not a reflection of her past performance in the previous year but of her potential performance in the coming year. Hiser also claims that Rowland advised that she needed to get doctors to see past her pretty face.

In February 2007, Hiser met with Rowland for their first field visit. She claims that during this meeting, Rowland told her that numerous people had told him that she was "negative" and "unapproachable." Hiser also claims that during a discussion about the dosage of product samples Hiser had given a customer, Rowland questioned her decision and asked her if she "had a brain in her head." Hiser also claims that Rowland reiterated that she needed to get doctors to see past her pretty face, and suggested that she read a self-help book to determine if pharmaceutical sales was the right job for her.

In late February or early March 2007, Hiser attended a national sales meeting in Atlanta along with other sales representatives. During a meeting, Rowland and Robin Strezminski engaged in a role-playing exercise where Rowland played a client known to be a "hugger." Hiser testified that when Strezmenski put her hand out to Rowland for a handshake Rowland began hugging her instead. Hiser further testified that while she felt Rowland's actions to be inappropriate, Strezmenski did not appear to be offended.

In March 2007, Hiser attended a meeting in Cherry Hill, New Jersey with her team members. During this meeting, Hiser had limited interactions with Rowland and did not observe Rowland say or do anything inappropriate. However, Hiser claims that Rowland made an offensive comment at a meeting held in Radnor, Pennsylvania later than month. At the Radnor meeting, Hiser claims that Rowland told the group that he had a conversation with his wife about "suckling on the breast of corporate America." Hiser further claims that, while making this comment, Rowland gestured towards two nursing mothers who periodically left meetings to breastfeed their children.

At some point during this time, Hiser spoke to Rowland about one of her new sales partners, Jason Chapman. Specifically, Hiser informed Rowland that Chapman had referred to her and other female employees as "honey" and that it bothered her. Hiser claims that Rowland responded, "but Ashley, you have no idea, him calling someone honey might make their heart go piter-pater." (Hiser's Deposition, p. 151:9-11) Hiser further claims that she reiterated that she did not want to be referred to as "honey," and that Rowland assured her that Chapman would not call her that again. Hiser also claims that Rowland called her "honey" on two occasions and that Chapman "slipped a couple times, but for the most part . . . he had stopped." (Hiser's Deposition, p. 153:7-9)

In April 2007, Hiser reported Rowland's behavior to Defendant's Human Resources ("HR"). Hiser claims that she decided to file a complaint with HR after realizing that Rowland treated male employees more favorable than women and was generally dismissive of female employees who were not responsive to his sexual flirting and inappropriate jokes. According to Hiser, Rowland provided her male sales partner, Chapman, with coaching but refused to provide her with the same and told her that

women would have to work harder than men to prove themselves. Hiser also claims that she learned of Rowland's harassing behavior towards other females when several female sales representatives shared their personal encounters with Rowland. Shortly after making a formal complaint to HR, Reyes alleges that she was told that Rowland was made aware of the complaints, and that Defendant was going to assist him in improving his management skills. However, Hiser was not removed from Rowland's supervision.

In May 2007, Plaintiff went on a field visit with Rowland. During the visit, Rowland told her that she needed to improve as a saleswoman and that she received a competency assessment score of 0.8 out of 3.0. Plaintiff claims that the average score on this test was approximately 1.5 and that because of her score, she did not receive the competency bonus that other members of her team received. Hiser testified that she was shocked and concerned that she was given the assessment score because of her complaint to HR.

Shortly after her last interactions with Rowland, Hiser claims that she began to experience stress and anxiety and that her doctor recommended that she avoid working with Rowland. Plaintiff claims that due to her health issues, she took a medical leave of absence in June 2007. During her medical leave, Plaintiff resigned. Plaintiff claims that she decided to resign because she did not believe that Defendant would do anything about Rowland's behavior. Plaintiff received a job offer from another company one week after her resignation.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

4

matter of law." FED. R. CIV. P. 56(c); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. See Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Under Rule 56(e), the opponent must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-movant. See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001).

## III. DISCUSSION

### A. Hostile Work Environment

"The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001) (citations omitted). Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." To succeed on a hostile work environment claim, the plaintiff must establish that: 1) she suffered intentional discrimination because of her membership in a protected class; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected her; 4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and 5) there is a basis for holding the employer vicariously liable. Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100,104 (3d Cir. 2009). A plaintiff must establish, by the totality of the circumstances, the existence of a hostile or abusive working environment, which is severe enough to affect the psychological stability of a minority employee. Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir.1990) (quoting Vance v. S. Bell Tel. and Tel. Co., 863 F.2d 1503, 1510 (11th Cir.1989)).

Hiser claims that she was subjected to a hostile work environment because of her sex. In support of her claim, Hiser alleges the following acts: during group meetings, Rowland stated that he loved women and loved being around women and referred to female employee's as "pretty girls" and "Barbie dolls;" Rowland referred to Hiser as "honey," after she asked him not to; Rowland constantly advised Hiser that she needed to

get clients to see past her pretty face; and Rowland made a comment at a group meeting about suckling on the corporate breast while gesturing toward two breastfeeding mother-employees. Hiser also predicates her claim on several incidents that were told to her by other female employees, which includes the alleged harassment toward Ana Reyes, Maragaret Tourtellotte, and Jennifer Kover.[1]

Based on this evidence, Hiser cannot meet the first element of the hostile work environment claim. Hiser cannot claim that Rowland intentionally discriminated against her by primarily pointing to comments and conduct directed at other female representatives, such as Reyes, Tourtellotte, and Kover. "While case law recognizes that offensive statements made to a female other than the plaintiff can contribute to creating a hostile work environment, the plaintiff in those cases had herself been a target of the discriminatory conduct at some point and the evidence of such conduct toward other female employees was used only to bolster the plaintiff's case." Cooper-Nicholas v. City of Chester, No. 95-6493, 1997 U.S. Dist. LEXIS 20810, at *13 (E.D. Pa. 1997) (citations omitted). See also Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005) (finding that a plaintiff could not meet the first element of a hostile work environment claim where the plaintiff was neither on the receiving end nor the subject of any overt comments). Aside from Rowland allegedly referring to Hiser as "honey" on two occasions and advising her to get clients to see past her pretty face, Hiser's hostile work environment claim is predominantly anchored on incidents involving other individuals.

---

[1] Hiser alleges that these female employees shared with her their personal encounters with Rowland. According to Hiser, Maragaret Tourtellotte told her that Rowland suggested that she speak with her husband about being a working mother. Hiser also claims that Ana Reyes shared with her that Rowland referred to her as a poor, little Hispanic woman. Finally, Hiser claims that Jennifer Kover told her that Rowland stated that once the woman's hormones stop raging they wull change their mind about leaving the company.

7

More important, without more evidence, it is difficult for the Court to find that Rowland's "honey" reference and suggestion that Hiser get clients to see her core value constitute discriminatory conduct. Although overtly discriminatory conduct is not required to show intentional discrimination, see Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996), the presence or absence of such conduct often proves helpful when evaluating whether facially neutral conduct is driven by invidious motives. See Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001) (reasoning that in light of a supervisor's overtly discriminatory comments, the facially neutral conduct complained of constituted evidence "from which a jury might find ethnic animus underlying other ostensibly nondiscriminatory incidents."). The fact that Hiser does not point to any overtly discriminatory conduct or comment directly targeted to her lends further support to the conclusion that she fails to demonstrate discriminatory animus.

However, even assuming that such acts were targeted to Hiser because she is a woman, these actions are not severe or pervasive enough to make out a claim for hostile work environment. In analyzing whether the plaintiff's work environment meets the severity or pervasiveness prong, the Court looks to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). Title VII will not give a plaintiff relief for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Hiser's hostile work environment claim boils down to Rowland's sporadic

reference to Hiser as "honey" and offhanded comment about Hiser getting clients to see past her pretty face. While arguably discourteous and unprofessional, Rowland's comments were not physically threatening or humiliating. Moreover, it is difficult to see how these few comments, including the alleged incidents not witnessed by or directly targeted to Hiser, rise to the level of extreme conduct sufficient to change the terms and conditions of Hiser's employment. To be sure, Hiser testified that many of the alleged sexually hostile incidents, such as Rowland referring to women as "pretty girls" and "Barbie dolls" or his preference for hugs over handshakes, merely made Hiser "suspicious" of Rowland. (Pl.'s Opposition Br., p. 6) Consequently, Plaintiff has likewise failed to establish the second factor of a hostile work environment claim, which makes summary judgment in favor of the defendant appropriate on this count.

**B.      Sex Discrimination[2]**

To establish a prima facie case of race or sex discrimination, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination. Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). An adverse employment action is one that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment. Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). An adverse employment action must be material. Schmidt v. Montgomery Kone, Inc., 69 F. Supp. 2d 706, 713 (E.D. Pa. 1999) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1301 (3d Cir. 1997)). Not everything that makes an employee unhappy is an

---

[2] As stated above in the Court's discussion of Plaintiff's hostile work environment claim, the analysis under Title VII and the Pennsylvania Human Relations Act is the same. Weston, 251 F.3d at 426 n.3.

actionable adverse action. Young v. St. James Mgmt., LLC, 749 F. Supp. 2d 281, 289 (E.D. Pa. 2010).

Defendant contends that Plaintiff cannot make out a prime facie case of sex discrimination because she fails to present evidence that she suffered an adverse employment action. Specifically, Defendant argues that Plaintiff was not terminated and never received any sort of disciplinary warning, suspension, or demotion. Additionally, Defendant states the Plaintiff cannot assert a claim for constructive discharge as her adverse employment action because the claim has not been properly administratively exhausted. Plaintiff disputes Defendant's assertions, arguing that she was constructively discharged and, therefore, did in fact suffer an adverse employment action. Additionally, Plaintiff argues that similarly situated males were treated differently, which gives rise to an inference that her constructive discharge was a result of unlawful discrimination.

Assuming, without deciding, that Plaintiff's constructive discharge claim satisfies her administrative requirements, Plaintiff has not pled sufficient facts to establish a claim for constructive discharge. In order to establish a claim for constructive discharge, a plaintiff must show that the defendant "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984). Moreover, a plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment. The Third Circuit has delineated several adverse actions that are commonly cited by employees claiming that they were constrictively discharged, including (1) threats of discharge; (2) being urged to resign or retire; (3) demotion or reduction in pay or benefits; (4) involuntary transfer to a less

desirable position; (5) alteration of job responsibilities; and (6) being given unsatisfactory job evaluations. Clowes v. Allegheny Valley Hosp., Inc., 991 F.2d 1159, 1161 (3d Cir. 1993). However, the Third Circuit has also noted that "in most situations, a prerequisite to a successful constructive discharge claim is that plaintiff attempted to explore alternatives before electing to resign." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 975 (3d Cir. 1998) (basing a significant part of its holding that no constructive discharge had occurred on the fact that the plaintiff did not attempt to explore any alternatives before resigning).

In Duffy v. Paper Magic Group, 265 F.3d 163, 169 (3d Cir. 2001), the Court found that there was no constructive discharge where the situation was stressful and frustrating, but did not reach the threshold of intolerable. The Court stated that the plaintiff's tasks remained the same, she was never assigned to any degrading or menial tasks, and that even though she had to work more hours because of staff shortages in her department, that change made her job stressful, not unbearable. Id. Additionally, the Court did not allow the plaintiff to use her physician's opinion that her job had an adverse effect on her health to prove that her working conditions were intolerable. Id. at 170. The Court noted that the health problems supported an inference that the workplace was stressful, but that a stressful environment does not amount to a constructive discharge. Id.

Similar to the plaintiff in Duffy, Plaintiff fails to make out a successful claim of constructive discharge because she fails to allege conduct that rises to the level that would force a reasonable person to resign. Plaintiff remained in the same position during the course of her employment, does not allege that she was assigned menial tasks, and

was not threatened with discharge or demotion. The fact that Rowland suggested that Plaintiff review a self-help book on the pharmaceutical industry does not amount to a "threat" of discharge or demotion. Moreover, the fact that Plaintiff received an unfavorable performance review is not adverse enough to make a reasonable person walk away from employment. See, e.g., Acosta v. Catholic Health Initiatives, Inc., No. 02-1750, 2003 U.S. Dist. LEXIS 1079 (finding negative performance review not an adverse action where it did not threaten termination and the review expected the employee to make improvements)

Plaintiff's claim also fails because she did not make a reasonable attempt to explore alternatives within the company before deciding to resign. While on medical leave, Plaintiff stated that she spoke with Human Resources about returning to work in October 2007, but assumed Defendant was not going to take any action with regard Rowland and her complaints. Plaintiff did not attempt to explore alternatives within the company and does not suggest that alternatives were not available to her. Based on these facts, the Court does not find that Plaintiff has presented sufficient evidence to establish a claim for constructive discharge. Accordingly, summary judgment is granted for the Defendant on this claim.

**C.     Retaliation**

Plaintiff has asserted a claim for retaliation for the first time in her Summary Judgment Response. Summary judgment is not a mechanism to amend pleadings for the first time. Spence v. City of Philadelphia, 147 Fed. Appx. 289, 291 (3d Cir. 2005) (holding that plaintiff was precluded from asserting a new theory of liability at summary judgment because it would have "impermissibly prejudiced" the defendant who would

face different burdens and defenses under the new theory of liability and because "[u]nder the court's precedent, a claim that has not been timely raised is waived"). Because Plaintiff did not plead a retaliation claim in her Complaint, Plaintiff has waived this claim and summary judgment is granted for Defendant.

## IV.     CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in part and denied in part. An appropriate order follows.