**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MARGARET TOURTELLOTTE, et al.,
   **Plaintiffs,**

  v.

ELI LILLY AND COMPANY, et al.,
   **Defendants.**

: :
: :
: :
: :
: :
: :
: :
: :
: :

**CIVIL ACTION**

**NO. 09-0774**

## OPINION

Presently before the Court are Defendant Eli Lilly's Renewed Motion for Summary

Judgment as to all claims by Plaintiff Ana Reyes (Doc. 95), Plaintiff Ana Reyes's Response in

Opposition thereto (Doc. 106), Defendant's Reply Brief in Further Support of Its Motion for

Summary Judgment (Doc. 114), and Plaintiff's Letter Brief in Response to Defendant's Reply

(Doc. 120).   Upon consideration of the parties' motions with briefs, and for the reasons set forth

below, Defendant's motion will be granted in part and denied in part.

## I.  FACTUAL BACKGROUND

Plaintiff, Ana Reyes ("Reyes"), has brought this action against Defendant, Eli Lilly

("Defendant" or "Lilly"), her former employer, for alleged violations of Title VII of the Civil

Rights Act of 1964, the Americans with Disabilities Act ("ADA"), the Pennsylvania Human

Relations Act ("PHRA"), and 42 U.S.C. § 1981.   Reyes began working for Defendant in June

2004 as a treatment team specialist.   The treatment team specialist position was eliminated in

2006, and Reyes became a senior sales representative who reported to Chris Hudson as her District

Sales Manager.   Reyes's 2006 Performance Management Evaluation indicated that she

"successfully transitioned into this selling role [and] developed strong relations with key

customers." (Def.'s Ex. B). However, the evaluation also stated that her "[p]erformance expectations were not achieved as evidenced across the portfolio." (Def.'s Ex. B). Nevertheless, the evaluation indicated that Reyes was eligible for a merit increase "based on performance." (Def.'s Ex. B.)

In January 2007, Reyes learned that Timothy Rowland ("Rowland") would be her new supervisor. Reyes met with Rowland and her partner, Chad Pulliam ("Pulliam"), after returning from medical leave in January 2007. During the meeting, Reyes gave Rowland a report regarding various customers. Reyes alleges that, while she was speaking, Rowland stopped her and told her to stop assuming what she did not know. Reyes claims that she attempted to explain to Rowland that she did know the information and Rowland began yelling at her. Reyes further claims that her eyes became watery and she did not speak throughout the remainder of the meeting. The following day, Reyes had an individual meeting with Rowland. During the meeting, Rowland told Reyes that he was raised by females and loved being around them. Rowland also told Reyes that she reminded him of a poor Hispanic woman whom he had helped to get a job which better suited her.

During the same month, Rowland accompanied Reyes on a field visit to observe her sales techniques. Rowland gave Reyes positive feedback and constructive criticism on her sales calls, and Reyes thought all of Rowland's feedback, except his feedback on off-label use, was helpful. According to Reyes, Rowland became angry with her for not thanking the doctor for finding alternative ways to use their product. In response to Rowland's feedback, Reyes asked Rowland for coaching on business acumen, and Rowland told her that coaching her would be difficult. Reyes claims that he likened it to coaching his son to be a famous basketball player. She also claims that Rowland told her that she should seek other positions within the company because she

was not a good fit for the sales representative position.

In February 2007, Rowland met with Plaintiff to inform her that she would be receiving a one percent merit increase for her 2006 performance. This merit increase was based on the recommendation of Reyes' former supervisor, Chris Hudson. Reyes claims that when she asked Rowland why the merit increase was so low, Rowland told her that that was what she deserved. Reyes also claims that Rowland told her that he wished to eliminate some people on the sales team, reiterated that she should seek a position at Lilly in which she could better use her language background, compared her to his son and the poor Hispanic woman he once knew, and ignored her renewed request for coaching. In the same month, Reyes had a second field visit with Rowland. During this field visit, Rowland noted that Reyes failed to increase sales with key doctors in her territory and advised that she contact Human Resources to better understand where her talents could best serve Lilly. In response to Rowland's feedback, Reyes once again asked Rowland for a mentor to assist her with developing business acumen, and told him that Pulliam told her that he had received a mentor.

Shortly thereafter, in late February or early March 2007, Reyes attended a 4-day regional meeting in Atlanta. Reyes alleges that several incidents during the meeting offended her. According to Reyes, Rowland mocked her Hispanic accent while saying "poor Ana Reyes," he ridiculed another employee's Hispanic accent when saying, "oh my God, when is he gonna finish," and insisting that the employee needed speech coaching, he made a comment about how Lilly representatives were once white males but are now "Barbie dolls," and he chose Pulliam to give a presentation on a document created by Reyes. Reyes also alleges that Rowland made several offensive comments at other meetings. For instance, Reyes claims that Rowland told her, in a Hispanic accent, "honey, I can't see you in front of a group," he made a comment about another

female employee (Margaret Toutellotte) being unable to perform her job because she was too concerned with breastfeeding and being a mother, and he permitted the male sales partner of two other female employees to give presentations and conduct activities that the women were not given the opportunity to do.   Reyes also claims that Reyes treated women more favorable if they responded to his sexual jokes and flirting.

In March 2007, Reyes had a meeting with Rowland and Pulliam for a simulation. Following the meeting, Reyes had scheduled dinner with Pulliam, Rowland, and a doctor with whom it was difficult to schedule an appointment.   Reyes claims, that before dinner, Rowland told her that the dinner with the doctor was "going to be a guy's meeting" and a "guy night." Reyes did not attend the dinner meeting.   The following month, Reyes attended a meeting with Rowland and her sales team.   The purpose of the meeting was to discuss an initiative focused on doctors who historically had been prescribing Lilly products heavily but were no longer doing so. At the meeting, Rowland asked Reyes how she would explain to a doctor why she was spending money on lunches and dinners for him.   Reyes told Rowland that she did not know because she did not believe that she was supposed to explain to the doctors that everything she is doing is to get them to prescribe Lilly products.   Reyes also informed Rowland that a particular doctor told her that he did not like Rowland's sales approach during a previous field visit.   According to Reyes, her comment regarding the doctor's critique made Rowland's face turn red and he became angry. Reyes further alleges that Rowland pulled her aside after the meeting and told her that she was receiving a verbal warning for what they had previously spoke about.   Reyes claims that she did not recall any previous conversation to which Rowland was referring.

In April 2007, Reyes made a complaint about Rowland to the Human Resources ("HR") Department.   Reyes told HR Representative Matt Morgan ("Morgan") that she was stressed

4

because she was being discriminated against, harassed, mistreated, and retaliated against because she was a female with an accent.   Morgan told Reyes that Lilly would conduct an investigation. Reyes claims that, shortly after she made her complaint to HR, Rowland became even more hostile toward her.   Reyes specifically alleges that, during a field visit in April 2007, Rowland required her to unwrap brick samples that the representatives had sent to doctors, but did not require Pulliam to do the same.   During the same field visit, Rowland noticed that some of the samples in one of the doctor's sample cabinet had expired, and told Reyes that he would be contacting Lilly 's Sample Accountability Department to determine whether she provided the samples to the doctor. Reyes denied responsibility for providing the expired samples and claims that Rowland became very mad and started yelling at her.

In May 2007, Reyes went on medical leave because she was reportedly experiencing anxiety and depression.   Following her initial request for medical leave, Reyes submitted and Lilly approved four requests to extend her leave.   While out on medical leave, she contacted HR representative Lori Cochrane to tell her that her doctor recommended that she no longer work with Rowland.   However, HR representative Steve Washburn contacted Reyes to inform her that Defendant could not accommodate her request. While out on medical leave, Reyes filed a Charge of Discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC").   The EEOC marked the charge "received" on August 8, 2007.

Reyes returned to work in December 2007 under Rowland's supervision, and Rowland and Reyes had their first meeting since her return in January 2008.   Reyes claims that, during the meeting, Rowland told her that if she was sick from seeing him once a month, she would be sick now from seeing him two to three times per week because he would be following her very closely.

On January 9, 2009, immediately following the meeting with Rowland, Reyes went out on leave again, this time for bronchitis and asthma.   Reyes alleged that, during this leave, she relapsed into a depression and was admitted to the hospital for her condition.   Due to her circumstance, Reyes sought to extend her medical leave of absence to March 3, 2008.   HR Representative Washburn informed Reyes that her leave would only be approved through February 18, 2008.   Reyes expressed her willingness to work, but asked Washburn to assign her a different supervisor. Washburn declined her request for reassignment.   Reyes did not return to work on February 18, 2008, and she received notice of her termination on February 21, 2008.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008).   A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008).   A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.   See Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).   The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.   See Celotex v. Catrett, 477 U.S. 317, 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."   Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986)).   Under Rule 56(e), the opponent must set forth specific facts showing a genuine

issue for trial and may not rest upon the mere allegations or denials of its pleadings.   See Martin v.

Godwin, 499 F.3d 290, 295 (3d Cir. 2007). At the summary judgment stage, the court's function is

not to weigh the evidence and determine the truth of the matter, but rather to determine whether

there is a genuine issue for trial.   See Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253

(3d Cir. 2007).   In doing so, the court must construe the facts and inferences in the light most

favorable to the non-movant.   See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v.

Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001).

## III.   DISCUSSION

## A.   Exhaustion of Administrative Remedies

Defendant argues that Plaintiff's claims for disability discrimination and all sex

discrimination claims which post-date her EEOC Complaint should be dismissed because Plaintiff

failed to exhaust her administrative remedies with regard to those claims.   Title VII requires that

claimants exhaust their administrative remedies before they may proceed in federal court.

Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997).   Prior to filing a claim in federal court, a

Title VII plaintiff must first file a discrimination charge with the EEOC, which may issue a "right

to sue" letter if it does not resolve the matter within 180 days.   42 U.S.C. § 2000e-5(e)(1), (f)(1).

The scope of a federal claim is determined by the "scope of the EEOC investigation which can

reasonably be expected to grow out of the charge of discrimination." Hicks v. ABT Assoc., Inc.,

572 F.2d 960, 966 (3d Cir. 1978).   Thus, upon determining whether a plaintiff has exhausted her

administrative remedies with regard to a particular claim, the Court must inquire "whether the acts

alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or

the investigation arising therefrom."   Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting

Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984) (per curiam)). "In determining the scope of the investigation, the court must examine: 1) whether the disputed claim would have been discovered by the EEOC in the course of a reasonable investigation; and 2) whether the claim 'which would have been uncovered [was] reasonably within the scope of the charge filed with the EEOC." Davis v. Kraft Foods North America, 2006 WL 237512, at *6 (E.D. Pa. Jan. 31, 2006)(quoting Hicks, 572 F.2d at 967).

### 1. ADA Claim

Plaintiff has failed to exhaust her administrative remedies with regard to her disability discrimination claim because a claim for disability was not within the scope of her EEOC complaint or the investigation arising therefrom. In her Charge of Discrimination, Plaintiff checked the boxes for race, sex, national origin, and retaliation. (Pl.'s Ex. I). Although the form contains a box for disability discrimination, Reyes left this box empty. (Id.) On the Charge Information Questionnaire, Plaintiff checked off the boxes for race, national origin, sex, and retaliation, and in response to the prompt to identify herself as it relates to the basis for discrimination, Plaintiff wrote, "I am Hispanic and a national from the Dominican Republic." (Id.) Plaintiff also attaches to her charge a document explaining the type of harm that she encountered. Plaintiff wrote: "Due to Mr. Rowland's behavior, I have suffered mental and physical distress and loss of pay. I am currently on Medical Leave and am taking medication for anxiety as a result of this treatment." (Pl.'s Ex. I at 4). Plaintiff argues that this comment could have reasonably given rise to an investigation into a possible disability discrimination claim. This Court disagrees.

It is quite common in employment discrimination claims for employees to cite to some mental distress or absences which result from the alleged discriminatory conduct. If an investigation into disability discrimination is expected to arise from every instance in which a

plaintiff alleged that discriminatory conduct resulted in absences or mental distress, the EEOC would find itself vastly overburdened. Plaintiff's statement regarding her mental health, particularly considering that many discrimination claims are brought under the hostile work environment framework, do not reasonably suggest that she intended to assert a claim for disability discrimination. Therefore, Plaintiff's disability discrimination claims are dismissed for failure to exhaust administrative remedies.[1]

### 2. *Title VII and PHRA Claims*

The opposite is true for Plaintiff's sex and race discrimination claims which post-date her Charge for Discrimination. Defendant argues that claims which post-dated Plaintiff's charge cannot be considered to be within the reasonable scope of an investigation of that charge. However, the mere fact that additional actions relating to Plaintiff's claims for retaliation and race and sex discrimination took place after her Charge was filed does not suggest that these post-charge claims were not properly exhausted. "[T]he parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission." Robinson v. Dalton, 107 F.3d 1018, 1025-26 (3d Cir. 1997) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976)).

In Waiters v. Parsons, 729 F.2d 233 (3d Cir. 1984), the Plaintiff filed a formal complaint with the EEOC alleging continuing discrimination in retaliation for having made an earlier

---

[1] The Court's conclusion that Plaintiff has failed to exhaust her administrative remedies as to her claim for disability discrimination is further supported by the fact that Plaintiff filed her discrimination charge with the assistance of counsel.

informal complaint. 729 F.2d at 235. The EEOC conducted an investigation in which it concluded that the plaintiff had been discriminated against for opposing practices unlawful under Title VII. Id. The following year, the plaintiff was discharged. Id. at 236. When the plaintiff filed suit, the district court dismissed her complaint for failure to exhaust her administrative remedies. Id. The Third Circuit reversed on appeal and held that the plaintiff did not need to file a separate EEOC charge alleging retaliatory discharge because the EEOC investigation went beyond the specific allegations in the complaint and looked at the employer's entire conduct. Id. at 238. Because the plaintiff alleged that her discharge was the product of the same retaliatory intent which she alleged in her EEOC complaint, the Third Circuit concluded that although the officials and acts were different, "the core grievance – retaliation – is the same, and at all events, it is clear that the allegations of the appellant's complaint fall within the scope of the district director's investigation of the charges contained in the 1979 formal complaint." Id.

Similarly, in Robinson v. Dalton, 107 F.3d 1018 (3d Cir. 1997), the Third Circuit remanded a case in which the plaintiff had filed three separate complaints with the EEOC Office alleging racial discrimination and retaliation. 107 F.3d at 1019. All three complaints were related to the plaintiff's sick leave. Id. The complaints were consolidated and resulted in a finding of no discrimination. Id. The plaintiff was also absent from his job without authorization in an incident not included in his consolidated complaints. Id. His employer, the Navy, informed the plaintiff that it proposed to remove him from his employment due to excessive unauthorized absences. Id. The plaintiff submitted what the employer considered to be an inadequate explanation for his absences, after which his employment was terminated. Id. at 1010. The plaintiff then filed a lawsuit in federal court claiming that he was fired in retaliation for the previous charges of racial discrimination. Id. The Third Circuit noted that upon a Request to

Reopen, the EEOC "expressly declined to include [the plaintiff's] later discharge in its investigation," but that in <u>Hicks v. ABT Associates, Inc.</u>, 572 F.2d 960, 965 (3d Cir. 1978), this Circuit held that "if the EEOC investigation is too narrow, a plaintiff should not be barred from raising additional claims in district court." <u>Id.</u> at 1025. Despite the EEOC's limited investigation to the charge of race discrimination, the important question is whether the EEOC's investigation was reasonable. <u>Id.</u> To determine this, the Third Circuit set out a number of factors including: "1) whether the previous three complaints alleged the same retaliatory intent inherent in the retaliatory discharge claim . . . 2) whether the subject of these previous complaints were used as a basis for the Navy's decision to terminate Robinson; and 3) whether the EEOC should have been put on notice of Robinson's claim of retaliatory discharge and therefore investigated that claim." <u>Id.</u> at 1026.

In the present case, Plaintiff Reyes filed her Discrimination Charge on or around July 24, 2007, and the EEOC received the charge on August 8, 2007. Plaintiff's employment with Defendant was terminated on February 17, 2008. Plaintiff's Notice of Right to sue was sent on November 12, 2008, indicating that the EEOC was terminating the processing of her charge. (Ex. J.) Plaintiff's charge alleged discrimination based upon her race, sex, and retaliation. Because the EEOC's investigation extended into November 2008, a reasonable EEOC investigation would have inquired into the fact of Plaintiff's termination on February 17, 2008 as well as other post-charge conduct, including Defendant's refusal to assign Plaintiff to a different supervisor. Therefore, Plaintiff's claims regarding conduct that took place after the filing of her Charge, including her discharge, were properly exhausted, and do not warrant dismissal.

**B.     Hostile Work Environment**

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."   To succeed on a hostile work environment claim, the plaintiff must establish that: 1) she suffered intentional discrimination because of her membership in a protected class; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected her; 4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and 5) there is a basis for holding the employer vicariously liable.   Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100,104 (3d Cir. 2009).[2]   A court should consider all the circumstances in determining whether an environment is hostile or abusive, including the "frequency of the discriminatory conduct, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

Courts may not impose Title VII as a civility code of the workplace. See Faragher v. City of Baco Raton, 524 U.S. 775, 788 (1998) (the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code'")(citation omitted). Title VII is not violated by "[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe and pervasive as to constitute an objective change in the conditions of employment.   Id. (citation omitted). Accordingly, occasional insults, teasing, or episodic instances of ridicule are not severe enough to permeate the workplace and change the very nature of the plaintiff's employment.   In examining a

---

[2] The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.   Huston v. Proctor & Gamble Paper Products Corp., 568 F.3d 100,104 (3d Cir. 2009).

hostile work environment claim, the court should "consider the totality of the circumstance, rather than parse out the individual incidents, to determine whether the acts that collectively form the continuing violation are severe and pervasive."   Mandel v. M&Q Packaging Corp., 2013 U.S. App. LEXIS 864, at *21 (3d Cir. Jan. 14, 2013).

Reyes alleges that she was subjected to a hostile work environment because of her race and sex.   In support of her claim, Reyes alleges the following acts:   Rowland referring to her as a "poor Hispanic woman" he once knew; Rowland mocking her Spanish accent at a group meeting; having to complete tasks that were not expected of her male sales partner; being excluded from a business dinner that was attended by Rowland and her male sales partner; Rowland criticizing her work and insisting that she find a new position within the company that better suited her background, and Rowland refusing to provide her with sales coaching.   Reyes hostile work environment claim is also predicated on Rowland's conduct towards other Lilly employees, which includes the following acts: Rowland referring to female sales representatives as "Barbie Dolls" and "honey;" Rowland commenting on Lilly being historically made up of male employees; Rowland stating that Margaret Tourtellotte could not perform her job because she was too concerned with breastfeeding; and Rowland mocking another Lilly employee with a Spanish accent. [3]

_____

3 While the Court acknowledges that some of the alleged acts do not implicate a protected class, facially neutral incidents can support a finding of discriminatory animus when such conduct is viewed in the context of other, overtly discriminatory conduct.   See Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001).   The Court may also consider evidence of discriminatory conduct directed at individuals other than the plaintiff, especially where such evidence may assist the factfinder in determining whether facially neutral conduct was actually based on plaintiff's protected class.   See Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005) (permitting racist comments directed at others to be considered "in determining whether facially neutral conduct on the part of [the defendants] was actually based on the plaintiff's race.");   Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (1990) ("[W]e hold that the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment.").

Assuming, for summary judgment purposes, that these actions occurred as Reyes alleges, the actions identified by Reyes are not severe or pervasive enough to make out a claim for a hostile work environment.   Here, the alleged conduct of Rowland amounts to isolated events of offhanded comments which were offensive and suggestive of personal tensions or dislike, but not so severe or pervasive as to constitute an objective change in the condition of Reyes's employment.   While referring to Reyes as a "poor Hispanic woman" and mocking her Spanish accent constitutes derogatory behavior that should never be condoned:

> [R]acial comments that are sporadic or part of casual conversation do not
> violate Title VII.   For racist comments, slurs and jokes to constitute a
> hostile work environment, there must be more than a few isolated incidents
> of racial enmity, meaning that instead of sporadic racist slurs, there must be
> a steady barrage of opprobrious racial comments.

Al-Salem v. Bucks County Water & Sewer Authority, No. 97-6843, 1999 U.S. Dist. LEXIS 3609, at * 15-16 (E.D. Pa. March 25, 1999).   District courts have found that arguably more offensive actions are insufficient to satisfy a prima facie case.   See Jeffries v. Potter, 2009 U.S. Dist. LEXIS 13157, 2009 WL 423998, at *8 (D. Del. Feb. 19, 2009) (being called a "bitch" and "white honkey bitch" constitutes sporadic use of abusive language and does not rise to the level of a hostile work environment);   Boyer v. Johnson Matthey, Inc. No. 02-8382, 2005 U.S. Dist. LEXIS 171, at *16-17 (E.D. Pa. Jan. 6, 2005) (granting summary judgment after the plaintiff was called "boy" several times and the term "nigger-rigged" was used in the plaintiff's presence, but not directed at him); Barbosa v. Tribune Co., No. 01-1262, 2003 U.S. Dist. LEXIS 19483, at *15 (E.D. Pa. Sept. 25, 2003) (granting summary judgment on hostile work environment claim based on seven alleged incidents of discrimination over eighteen months including plaintiff's allegation that he was called a "spic" on numerous occasions).

Additionally, the gender-based conduct that Plaintiff alleges does not comprise an

objectively hostile work environment.   Title VII will not give a plaintiff relief for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."   Faragher, 524 U.S. at 788.   Reyes's claim is based on a few unpleasant incidents that do not rise to the "extreme" conduct needed "to amount to a change in the terms and conditions in employment."   Id.   Over the course of fourteen months, Reyes alleges that Rowland refused to provide her with a company mentor, failed to invite her to a client dinner, made her complete a task that was not expected of her male sales partner, criticized her sales performance and suggested she locate a non-sales position in the company, and, on a few occasions, made sexually inappropriate comments to or about other female employees.   While discourteous and unprofessional, Rowland's sporadic behavior was not physically threatening or humiliating.   Moreover, Reyes fails to provide evidence aside from bare assertions and mere speculation.   For example, even assuming her male sales partner had a company mentor, Reyes does not provide evidence suggesting that Rowland provided him with the mentor, that having a mentor was a recognized Lilly policy or practice, or that having a mentor is necessary for career advancement.

Simply stated, Reyes' hostile work environment claim fails for many of the reasons stated in this Court's discussion of her co-plaintiff's claim.   The plaintiffs' attempt to anchor a claim on sporadic incidents that are personal to them and then couple these few incidents to create a substantial claim is unavailing.   Certainly, the Court may consider discriminatory conduct towards individuals other than the plaintiff, but the Court will not permit plaintiffs to build his or her claim off of the grievances of others.   Accordingly, this Court finds that Reyes cannot establish a prima facie case of hostile work environment and summary judgment in Defendant's favor is appropriate.

## C.    Discrimination

Counts XXIII, XXV, XXVII, and XXVIII of Plaintiff's complaint allege that she was discriminated against on account of race and sex.   Because she relies on circumstantial evidence, her discrimination claims must proceed under the burden-shifting framework the Supreme Court articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).[4]   First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. <u>Matckzak v. Frankford Candy & Chocolate Co.</u>, 136 F.3d 933, 939 (3d Cir. 1997).   If the Plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action.   <u>Id.</u>   Finally, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.   <u>Id.</u>

To establish a prima facie case of race or sex discrimination, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination.   <u>Texas Dept. Of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981).   An adverse employment action is one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001).   An adverse employment action must be "material."   <u>Schmidt v. Montgomery Kone, Inc.</u>, 69 F. Supp. 2d 706, 713 (E.D. Pa. 1999) (citing <u>Robinson v. City of</u>

---

[4] Plaintiff alleges discrimination in violation of Title VII, §1981 and the Pennsylvania Human Relations Act ("PHRA").   State law claims pursuant to the PHRA for race and sex discrimination are analyzed under the same framework as federal claims brought under Title VII.   <u>See Jones v. Sch. Dist. Of Philadelphia</u>, 198 F.3d 403, 409 (3d Cir. 1999).   Additionally, "the elements of a § 1981 claim are identical to the elements of a Title VII employment discrimination claim." <u>Brown v. J. Kaz, Inc.</u>, 581 F.3d 175, 181-82 (3d Cir. 2009).

Pittsburgh, 120 F.3d 1286, 1301 (3d Cir. 1997)). "Not everything that makes an employee unhappy is an actionable adverse action." Young v. St. James Mgmt., LLC, 749 F. Supp. 2d 281, 289 (E.D. Pa. 2010). Additionally, an adverse employment action may give rise to an inference of discrimination when a similarly situated employee who is not within the protected class is treated more favorably. See, e.g., Jones v. Sch Dist. Of Phila., 198 F.3d 403, 413 (3d Cir. 1999).

Defendant contends that Plaintiff cannot establish the necessary elements of a prima facie case of discrimination. Specifically, Defendant argues that Plaintiff's discrimination claim is premised on trivial actions that merely made her unhappy, such as Rowland's performance criticism, disparaging remarks, and failure to provide Plaintiff with a mentor. None of these actions were serious enough to change the terms and conditions of her employment with the company. Defendant also contends that, although Plaintiff's discharge qualifies as an adverse action, Plaintiff fails to allege conduct to infer that the company's decision to terminate her for failing to return to work was discriminatory.

Plaintiff disputes the defendant's assertion, arguing that her discrimination claim is based on her ultimate discharge from the company and the February 2007 merit pay increase.[5] Plaintiff further contends that these adverse actions occurred under circumstances giving rise to an inference of discrimination. According to Plaintiff, the defendant's discriminatory motives may be inferred from the fact that similarly-situated males at Lilly were treated more favorably, especially her partner, Chad Pulliam. Plaintiff alleges that Chad was provided with a company mentor, but she was not, despite her repeated request to Rowland. Plaintiff also alleges that Rowland required her to complete tasks that were not expected of Chad, such as unwrapping brick

---

[5] Plaintiff also premises her discrimination claim on Washburn's refusal to accommodate her disability. (citation) Because her disability claim is dismissed for failure to exhaust administrative remedies, the Court will not consider this argument.

samples, and she was excluded from a particular meeting which Rowland designated as a "guy night." Plaintiff also points to incidents experienced by other female employees, including co-plaintiffs in the present action, to support her claim of discrimination on the basis of sex.

Here, Plaintiff has failed to make out a prima facie case of discrimination. To the extent Plaintiff's discrimination claim is based on her termination from employment, she fails to allege conduct giving rise to an inference of discrimination. Certainly, Defendant's decision to terminate Plaintiff constitutes a material change to the terms and conditions of her employment. But that alone is insufficient. Plaintiff must also prove that Defendant acted with discriminatory intent, as established by direct and circumstantial evidence. While Plaintiff points to Rowland's favorable treatment of her male sales partner, disparaging remarks, and dismissive encounters with other female employees, these allegations do not relate to the employment action at issue, which is Plaintiff's discharge. Certainly, these allegations regarding Rowland's remarks and behavior support her claim of hostile work environment, but they lend no support to the suggestion that Defendant terminated her because of her race or sex. Plaintiff has not alleged that Rowland had anything to do with Defendant's ultimate termination, or that similarly-situated employees were treated differently in a situation where they refused to return to work. Because Plaintiff fails to present sufficient evidence for a reasonable jury to infer that Defendant discriminated against her on the basis of race or sex, summary judgment is appropriate.

To the extent Plaintiff's discrimination claim is based on her February 2007 merit pay increase, the Court cannot say that this employment decision effected a material change in the terms and conditions of her employment. After all, Plaintiff is not alleging that she was <u>denied</u> a pay increase or promotion, but that she received a less than expected merit increase. Although a less than expected bonus may be an adverse action in the retaliation context, <u>see</u> <u>Keeley v. Small</u>,

391 F. Supp.2d 30, 48 (D.D.C. 2005), Plaintiff fails to point the Court to cases where such a scenario is sufficient to make out a prima facie case in substantive discrimination claims.  See Burlington Northern & Santa Fe R.R. v. White, 548 U.S. 53, 64 (2006) (reasoning that "adverse action" in retaliation claims is broader than "adverse action" required for a prima facie case in disparate treatment claims). Accordingly, the Court finds that Plaintiff's discrimination claim fails.   Moreover, the evidence presented demonstrates that Reyes former supervisor, Chris Hudson, conducted Reyes performance evaluation for 2006 and that her merit pay increase was ultimately decided by her regional manager, Brian Hafferty.   Thus, Plaintiff fails to sufficiently demonstrate that Rowland was involved in this determination.

**D.       Retaliation**

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 339 (3d Cir. 2006).   A plaintiff claiming retaliation under Title VII "must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). If Plaintiff establishes a prima facie case of retaliation, then the McDonnell Douglas burden-shifting analysis applies, in which Defendant must show a legitimate, non-retaliatory reason for its conduct. Id. at 342. If Defendant makes this showing, Plaintiff must then demonstrate that the "employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id.

Plaintiff establishes a prima facie case of retaliation.   Plaintiff engaged in protected activity when she complained about Rowland to Human Resources in April 2007 and when she filed a complaint with the EEOC in August 2007.[6]   Plaintiff alleges that she suffered an adverse employment action when ultimately terminated from her job for failing to return to work under Rowland's supervision.   Plaintiff further alleges that the series of events leading up to her termination, including Washburn's refusal to assign her to a different supervisor or reassign her to another area, are causally linked to her termination; and, therefore, she satisfies the elements of the retaliation test.   This Court agrees.

The Third Circuit has established a very broad scope of the type of evidence that can be probative of causation, and has held that "plaintiff may rely upon a broad array of evidence" to demonstrate a causal link.   Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283 (3d Cir. 2000). Some examples of such evidence are ongoing antagonism, inconsistent reasons for termination, and certain conduct toward others.   Id. at 280-81.   Importantly, however, the Third Circuit "has set forth no limits on what [it has] been willing to consider." Id. at 281.   Here, Plaintiff points to evidence that would allow a jury to infer a causal connection between her grievance and discipline. Within months of Plaintiff filing her complaint with Human Resources and the EEOC, Defendant denied Plaintiff's request to be assigned a new supervisor or to relocate to a different area.   Even after Plaintiff returned to work in December 2007 and allegedly relapsed into depression from Rowland's harassing remarks, Defendant still refused to assign Plaintiff a new supervisor and demanded that she return to work under Rowland's supervision.   Moreover, Defendant presents

---

[6] In its brief, the defendant avers that Plaintiff's retaliation claim is limited to the alleged conduct post-dating her complaint to HR, but pre-dating her Charge of Discrimination.   The Court disagrees.   As discussed in Section A of this opinion, Plaintiff's retaliation claim may include conduct post-dating her Charge of Discrimination since such conduct reasonably relates to the claims alleged in the EEOC charge.

no legitimate, non-retaliatory reason for denying Plaintiff's requests to be reassigned to a different supervisor or area.   While Defendant suggests that its legitimate reason for terminating Plaintiff's employment was due to her failure to return to work, a jury could find that the timing between the grievance and discipline, as well as the series of events that took place between the grievance and discipline, demonstrates that Defendant's stated reason for her termination was pretextual.

Farrell, 206 F.3d at 286 ("evidence supporting [a] prima facie retaliation case is often helpful in the pretext stage and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other.")

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in part and denied in part.   An appropriate order follows.