IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARGARET TOURTELLOTTE, et al., Plaintiffs, | : : : |
| v. | : CIVIL ACTION : |
| ELI LILLY AND COMPANY, et al., Defendants. | : NO. 09-0774 : : : |

**OPINION**

Presently before the Court is Defendant Eli Lilly's Renewed Motion for Summary Judgment as to all claims by Plaintiff Karla Krieger (Doc. 94); Plaintiff Karla Krieger's Response in Opposition thereto (Doc. 107); Defendant Eli Lilly's Reply in Support of its Renewed Motion for Summary Judgment (Doc. 116); and Plaintiff Karla Krieger's Surreply (Doc. 120). Upon consideration of the parties' motions with briefs, and for the reasons set forth below, Defendant's motion will be granted.

I.   FACTUAL BACKGROUND

Plaintiff Karla Krieger ("Plaintiff" or "Krieger") has brought the present action against Defendant Eli Lilly ("Defendant" or "Lilly"), her former employer, for alleged violations Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination. Krieger is an African American woman with a Bachelor's of Science in biology and Masters in technology management and business administration. Lilly hired Krieger in May 2005 to work as a pharmaceutical sales representative. As a pharmaceutical sales representative, Krieger was responsible for marketing Lilly's products to psychiatric hospitals in New Jersey. Krieger generally worked independently, but was required to attend an annual sales meeting, quarterly district

1

meetings, and a monthly day in the field with her district manager.

When Krieger first started working with Lilly, her district manager was David Green ("Green").  In 2006, Green was replaced as Krieger's district manager by Chris Hudson ("Hudson").  In June 2006, Krieger received a verbal warning from Hudson regarding her tardiness at a meeting.  In January 2007, Hudson was replaced as Krieger's district manager by Timothy Rowland ("Rowland").

Rowland first introduced himself to his team at a district meeting attended by Krieger.  Krieger alleges that during this meeting Rowland did not look at or make eye contact with her during the meeting; told Krieger, who had commented that she had completed Six Sigma training, that he did not think Six Sigma had a place in sales; said he married a woman, and loved women with blonde hair and blue eyes; said he took home economics in school because he wanted to be with women; at times cried; said he did not meet a black person until he was 18 years old; referred to female sales representatives as "Barbie Dolls" and "pretty girls;" and made a comment about breastfeeding in which he referenced two Lilly employees who were nursing mothers.

 Two weeks after the district meeting, Rowland met with Krieger to discuss her 2006 performance evaluation that Hudson prepared.  Hudson rated Krieger's performance as needing improvement in two of the seven leadership behaviors and as "successful" in others.  Krieger agreed with the strengths and weaknesses identified in her 2006 performance evaluation.  Based on Hudson's performance evaluation of Krieger, Krieger received a 3.5% merit pay increase.  At the meeting, Krieger claims that Rowland told her that her performance was terrible and that he would fire her if she did not improve.  Krieger grew increasingly frustrated with Rowland's comments and said to

him, "you know, Tim, when you come to someone else's house . . . ."  Krieger claims that Rowland cut her off and said to her, "house, house? . . . Speak English to me."  Krieger asked Rowland if he thought she was speaking in Ebonics, but Rowland did not answer the question and just repeatedly told Krieger to speak English.

In February 2007, about two weeks after Krieger's one-on-one meeting with Rowland, Krieger and her partner, Peter Puleo ("Puleo"), met with Rowland to discuss the fact that Krieger and Puleo's territory had fallen to the bottom of the district in sales due to changes in federal law that prohibited selling certain products to health facilities like those in their territory.  Krieger claims that Rowland would not acknowledge anything she said during the meeting; cut her off to listen to Peter; talked with Peter about "big breasted women" and a female sales representative that was "ditsy;" and referred to an African-American employee at Lilly as "the smartest black man" he knew.

During the same month, Krieger attended a team meeting in Atlanta.  Part of the meeting included role playing to work on sales skills and technique.  While Rowland was imitating a doctor while role-playing with a sales representative, Krieger claims that he said to the sales representative, "now you know what one of the problems is? You speak too fast.  You know black people do not speak fast."  Krieger was offended by Rowland's comment and whispered to her partner, "what makes him the authority on black people."  Krieger further claims that Rowland mocked a Dominican-born sales representative (Plaintiff Ana Reyes) and imitated her voice in a woman's accent, covered his ears when a Lilly director with s Spanish accent was speaking to the group, and made a comment about Lilly representatives once being men but now being predominantly Barbie dolls.  After the Atlanta meeting, many of the district members, including Krieger,

went to dinner followed by drinks at the hotel's bar. Krieger claims that, on their way to the bar, Rowland and sales representative Denise Reese ("Denise") were laughing and passing notes. Krieger further claims that Denise continuously commented about not having underwear on and touched Rowland in inappropriate ways.

In March 2007, Krieger reported Rowland's actions, including his behavior at the Atlanta meeting, to Lilly's Human Resources ("HR") department. Krieger claims that the HR representatives did not listen to her, and it appeared as though nothing was being done about her complaint since Rowland's harassing behavior toward her intensified. Krieger claims that Rowland spoke to her in a different manner than the one in which he took with Puleo; he walked six feet behind her during a field visit, a practice he did not participate in while with his male representatives; he wrote Krieger up for being late to a meeting, despite the fact that she was on time; and ignored her during group meetings. Krieger also claims that Rowland exhibited sexually inappropriate behavior toward other women.[1] Krieger further claims that, while she was relieved that Rowland did not hug her, white women were frequently hugged by him. Because of this treatment, Krieger decided to approach Rowland about relocating to North Carolina. Krieger claims that Rowland was unsupportive of her transfer.

In June 2007, Krieger attended a district meeting in New Jersey. After the meeting, the team, including Krieger, went to a dinner at the "Tiki Bar." Krieger claims that, at the "Tiki Bar," a discussion about who had the biggest muscles ensued and

---

[1] Krieger claims that Rowland made a comment about female employees doing what they've got to do in reference to wearing short skirts and no panties, and he permitted Denise Reese to give him massages, rub up against him, and touch his hair and buttocks. Krieger further claims that, in addition to Rowland treating her male partner better than her, she witnessed Rowland give the male partners of female sales representatives, Margaret Tourtellotte and Jennifer Kover, the opportunity to do presentations and conduct activities at meeting that the two women were not given the opportunity to do.

4

Denise dared Tim to take his shirt off, which Rowland and other male team members did.

In June 2007, after the New Jersey meeting, Krieger made another complaint to HR regarding Rowland's inappropriate behavior. Specifically, Krieger claims that she reported to Mike Messina ("Messina") that Rowland told her to speak "English" which she believed was a reference to not speaking Ebonics; referred to another black employee as "the smartest black man" that he knew; said he had not met a black person until he was 18 years old and that he had a great respect and love for women in the workplace; and made a comment about black people not speaking fast. Krieger also complained about Rowland's mistreatment of women that did not flirt with him and his behavior at the Tiki Bar. Messina believed that, if Krieger's allegations were accurate, Rowland could be in violation of Lilly policy. As a result, Messina began an investigation.

Lilly's HR department had also conducted investigations into Ashley Hiser's and Margarette Tourtellotte's complaints about Rowland. Morgan concluded Hiser's investigation by telling her that HR was going to work with Rowland on developing better management practice. In Messina's final conclusions of his investigation, he wrote to Rowland, "The facts discovered in the investigation did not substantiate the allegation(s) against you. We found no evidence that you violated Lilly's 'Conduct in the Workplace' policy." (Pl.'s Ex. H, at p.5)

In July 2007, Plaintiff received a written warning based on her pattern of tardiness dating back to the June 19, 2006 verbal warning she had received from Hudson. Krieger admits to being late to a few meetings, including a field visit in June 2007. The written warning also cited Krieger's failure to return Rowland's call. Krieger claims she did not answer the call because she had lost her cell phone. Krieger admits that Lilly required

her to have a cell phone and that her district expected her to return calls within a reasonable time period.

In September 2007, Krieger was placed on probation for failing to comply with Lilly policies. Krieger was placed on probation for turning back the clock in her computer while inputting information regarding sampling and submitting sampling cars late. Krieger later filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 26, 2007.

On June 13, 2008, Krieger completed her probation. By memo dated June 20, 2008, Rowland confirmed to Krieger that she had completed her probation period and reminded her that, pursuant to Lilly policy, she would not be eligible for another disciplinary probation for the three-year period that followed. In July 2008, Plaintiff was transferred to the cardiovascular division due a corporate realignment and her new supervisor was Dan Gold. Krieger claims that Gold was Rowland's mentor and friend at Lilly, and that she experienced problems almost immediately with Gold. Krieger claims that Gold incorrectly told her that she was still on probation and that if he wrote her up again she would be terminated.

On August 28, 2008, Krieger received a written warning from Gold. First, the warning cited Krieger for a violation of Lilly's Good Promotional Practices (GPP) Policy regarding permissible expenses for a business meal. Krieger admits that she spent more at a lunch event than $60 per attendee permitted under the Lilly policy but claims it was because some of the doctors did not attend. Second, the warning cited Krieger for poor performance, including tardiness and compliance with respect to a field visit, failing to complete/update a zoning and routing plan, and failing to update Performance

6

Case 2:09-cv-00774-PBT   Document 139   Filed 04/16/13   Page 7 of 20

Management documentation as instructed. Krieger admits that her duties as a sales representative included creating a routing plan and segmenting doctors in her territory by tier and that she had not finished either as of the time of the warning. But Krieger claims that, at the time she was disciplined, no one in her district was hounded or disciplined about completing their segments. Krieger also admits that she did not complete the assigned task of updating Performance Management documentation as the warning indicated.

In the fall of 2008, Krieger took medical leave to care for her husband who had been hospitalized. After Krieger returned to work, she and other sales representatives in her division were responsible for studying and preparing for a new Lilly product that was awaiting DFA approval. At the divisional meeting, representatives were required to demonstrate skill and proficiencies with respect to the product such as by practice detailing it at the meeting and passing a test about the product. Krieger failed the test. On November 4, 2008, Lilly terminated Krieger's employment. The reasons given for Krieger's termination was poor performance that included detailing at the meeting and not passing the test.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225,

7

229 (3d Cir. 2008).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  See Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  Under Rule 56(e), the opponent must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most favorable to the non-movant.  See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001).

III.   DISCUSSION

A.    Hostile Work Environment

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  To succeed on a hostile work environment claim, the plaintiff must

8

establish that: 1) she suffered intentional discrimination because of her membership in a protected class; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected her; 4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and 5) there is a basis for holding the employer vicariously liable. Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100,104 (3d Cir. 2009).[2] A court should consider all the circumstances in determining whether an environment is hostile or abusive, including the "frequency of the discriminatory conduct, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

Courts may not impose Title VII as a civility code of the workplace. See Faragher v. City of Baco Raton, 524 U.S. 775, 788 (1998) (the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code'")(citation omitted). Title VII is not violated by "[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe and pervasive as to constitute an objective change in the conditions of employment. Id. (citation omitted). Accordingly, occasional insults, teasing, or episodic instances of ridicule are not severe enough to permeate the workplace and change the very nature of the plaintiff's employment. In examining a hostile work environment claim, the court should "consider the totality of the circumstance, rather than parse out the individual incidents, to determine whether the acts that collectively form the

---

[2] The proper analysis under Title VII and the NJLAD is identical, as New Jersey courts have construed the protections of the two acts interchangeably. See Shepherd v. Hunterdon Dev. Ctr., 803 A.2d 611, 625 (N.J. 2002) (applying the standard to claims of hostile work environment based on race); Lehmann v. Toys R' US, Inc., 626 A.2d 445, 453 (N.J. 1993) (applying the standard to claims of hostile work environment based on sex).

9

continuing violation are severe and pervasive." Mandel v. M&Q Packaging Corp., 2013 U.S. App. LEXIS 864, at *21 (3d Cir. Jan. 14, 2013).

Krieger claims that she was subjected to a hostile work environment because of her race and sex. In support of her claim on the basis of race, she alleges the following acts: during a group meeting, Rowland states that he grew up in South Dakota where there were only white people, and that he did not meet a black person until he was eighteen years old; Rowland's request that Krieger speak English after she offered a metaphor about him coming into someone else's house; during a role-playing activity, Rowland critiqued a Caucasian employee for speaking too fast and commented that black people do not speak fast; and Rowland describing another black employee as the smartest black man he had ever met. In support of her claim on the basis of sex, she alleges the following acts: Rowland's comment about loving women with blonde hair and blues eyes and referring to women as "Barbie dolls" and pretty people; Rowland's statement about "suckling the corporate breast" while gesturing breastfeeding mother-employees; Rowland taking off his shirt in response to a dare from a female employee; and Rowland acting in a feminine manner and speaking in a lisp. Krieger also predicates her claim on Rowland's threat to fire her after two weeks of becoming her supervisor, Rowland not speaking to her during meetings with her sales partner, and Rowland's treatment of other minority employees, such as Ana Reyes.[3]

---

[3] While the Court acknowledges that some of the alleged acts do not implicate a protected class, facially neutral incidents can support a finding of discriminatory animus when such conduct is viewed in the context of other, overtly discriminatory conduct. See Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001). The Court may also consider evidence of discriminatory conduct directed at individuals other than the plaintiff, especially where such evidence may assist the factfinder in determining whether facially neutral conduct was actually based on plaintiff's protected class. See Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005) (permitting racist comments directed at others to be considered "in determining whether facially neutral conduct on the part of [the defendants] was actually based on the plaintiff's race."); Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (1990) ("[W]e hold that the pervasive use of

Assuming, for summary judgment purposes, that these actions occurred as Krieger alleges, the actions identified by her are not severe or pervasive enough to make out a claim for a hostile work environment.  First, Krieger's alleged conduct is not of a character that is "so objectively offensive as to alter the 'conditions' of the victim's employment."  Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998).  None of the acts individually even approach a "serious" level of offensiveness, and collectively they do not paint a picture of a hostile work environment permeated by a "steady barrage of opprobrious [discriminatory] comments."  Al-Salem v. Bucks County Water & Sewer Authority, No. 97-6843, 1999 U.S. Dist. LEXIS 3609, at * 15-16 (E.D. Pa. March 25, 1999).  While inexcusable and offensive, Rowland's comments were neither physically threatening nor humiliating and fall far short of the level required to establish the kind of severe, gender- or race-based, harassment that is legally actionable.  See Faragher, 524 U.S.  at 788 ("Conduct must be extreme to amount to a change in the terms and conditions of employment.").  "[D]iscourtesy or rudeness should not be confused with racial or [sexual] harassment," and "a lack of racial [or gender] sensitivity does not, alone, amount to actionable harassment."  Id. at 787 (citing 1 Barbara Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed. 1986)).

Second, this conduct was not pervasive.  By the Court's calculation, Krieger points to less than a dozen interactions with Rowland over the course of eighteen months, i.e. January 2007 through June 2008.  No reasonable juror could conclude that these particular encounters over the course of eighteen months amounted to "pervasive" or regular conduct.  Rather, these appear to be sporadic, "isolated incidents."  Faragher, 524

---

derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment.").

11

U.S. at 788.  Other courts have found more frequent, and often more severe, conduct also fails to meet the pervasiveness requirement.  See  Eldeeb v. AlliedBarton Sec'y Servs LTD, No. 07-669, 2008 WL 4083510, AT *7 (E.D. Pa. Aug. 28, 2008) (holding that the act of saying plaintiff's name in a demeaning way 26 times over a period of approximately 13 months did not constitute either severe or pervasive conduct), aff'd 2010 WL 3590640, at *2 (3d Cir. Sept. 16, 2010); Lulis v. Barnhart, 252 F.Supp.2d 172, 177-78 (E.D. Pa. March 24, 2003) (holding that nine incidents over the course of seventeen months did not amount to pervasive conduct);  Cooper-Nicholas v. City of Chester, No. 95-6493, 1997 WL 799443, at *3 (E.D. Pa. Dec. 30, 1997) (eight incidents of "unprofessional, offensive, and callow" sexual remarks over nineteen months not sufficiently "frequent or chronic").

       Third, most of the alleged acts were directed to either a group or specific individual other than Krieger.  Certainly, the Court may consider evidence of discriminatory conduct directed at individuals other than the plaintiff, especially where such evidence may assist the factfinder in determining whether facially neutral conduct was actually based on plaintiff's protected class.  However, evidence of such conduct should serve to bolster the plaintiff's claim, rather than provide its substantive basis.  See  Cooper-Nicholas, supra at *13 ("While case law recognizes that offensive statements made to a female other than the plaintiff can contribute to creating a hostile work environment, the plaintiff in those cases had herself been a target of the discriminatory conduct at some point and the evidence of such conduct toward other female employees was used only to bolster the plaintiff's case." ). Moreover, "comments referring to other individuals that were merely overheard by [Krieger] are the sorts of 'offhanded comments and isolated incidents' that the Supreme Court in Faragher, 524 U.S at 788, 118 S.Ct. 2275, cautioned should not be considered

12

severe or pervasive enough to constitute a hostile work environment." Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005); see also Heitzman v. Monmouth County, 728 A.2D 297, 304-05 (N.J. Super. May 11, 1999) ("[A] derogatory comment about another person generally does not have the same sting as an ethnic slur directed at a minority group member.").

Because the alleged circumstances do not permit the Court to draw the reasonable inference that Krieger was subjected to hostile work environment based on race and gender, summary judgment in favor of Defendant Lilly is appropriate.

**B.      Race and Sex Discrimination**

Krieger seeks relief under both Title VII, 42 U.S.C. § 2000e, et. seq., and the New Jersey Law Against Discrimination ("NJLAD") for discrimination on the basis of race and sex. Because she relies on circumstantial evidence, her discrimination claims must proceed under the burden-shifting framework the Supreme Court articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). [4]  First, Krieger has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Matckzak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997).  If she succeeds in proving the prima facie case, the burden shifts to Lilly to articulate some legitimate, nondiscriminatory reason for the adverse action. Id.  Finally, should Lilly carry this burden, Krieger must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Id.

To establish a prima facie case of employment discrimination, Krieger must

---

[4] Plaintiff alleges discrimination in violation of Title VII and the NJLAD.  Because these two acts are substantially similar and the courts generally interpret the NJLAD in accord with its federal counterparts. See Grigoletti v. Ortho Pharmaceutical Corp., 570 A.2d 903, 906-07 (N.J. 1990).

demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gave rise to an inference of unlawful discrimination. Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Applying the forgoing standard to the case at hand, Krieger fails to establish a prima facie case of discrimination. While the Court finds that Krieger satisfies the first three elements of the claim,[5] she failed to prove that the adverse actions – being placed on probation and ultimately terminated – took place under circumstances giving rise to an inference of discrimination.

Krieger attempts to demonstrate Lilly's violation of anti-discrimination laws under a disparate treatment theory by showing that she or others in her protected class were treated differently than similarly situated employees. See Townes v. City of Philadelphia, No. 00-CV-138, 2001 U.S. Dist. LEXIS 6056, at *7-8 (E.D. Pa. May 11, 2001) (holding that plaintiff failed to satisfy the fourth element of the prima facie case because she failed to prove that her employer had previously discriminated against her or others within her protected class). In this case, Krieger anchors her disparate treatment claim on Rowland's alleged discriminatory conduct against other Lilly employees who are women or racial minorities. Krieger points to evidence of Rowland treating female sales representatives, as well as racial minorities, differently than their white male partners. Krieger also argues that she was treated differently than her white male partner Peter Puleo in that while Rowland refused to speak to or look at her during meetings, walked six feet behind her during field visits, and threatened her with termination, similar

---

[5] Krieger has proven that she is a member of protected class given the fact that she is an African-American female and that she was qualified for her position at Lilly, as she possesses a master's degree in business administration and technology management in addition to her bachelor's degree. The parties do not dispute that Lilly's decision to place Krieger on probation and ultimately terminate her employment qualify as adverse employment actions under Title VII.

14

conduct was not exhibited toward Peter. However, Krieger presents no evidence, aside from her bare assertions, as to how she has actual knowledge about Rowland's interaction with Peter during field visits or Rowland's performance evaluations of Peter. Moreover, the testimonies of Krieger's co-plaintiffs also fail to be supported by anything more than their bare assertions. Although courts are to resolve any doubts as to the existence of genuine issue of fact against the parties moving for summary judgment, Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions.

Even if the Court believed Krieger established a prima facie case, Lilly still met its burden of demonstrating that they had a valid reason for the adverse employment decisions. Lilly's stated reason for Krieger being placed on probation and ultimately terminated seems reasonable on its face. Krieger was terminated from her employment after progressing through the company's progressive discipline system, which begins with a verbal warning and proceeds to a written warning, probation, and termination of employment. The record indicates that Krieger was verbally warned about her tardiness by supervisor Chris Hudson, and then later received a written warning from Rowland for her repeated failure to comply with the company's attendance policy. Krieger's written warning was also based on her failure to return Rowland's calls within a reasonable time. After being warned about her performance, Krieger was then placed on probation for turning back the clock in her computer while inputting information regarding sampling and submitting sampling cards late. Because Krieger was placed on probation, she was not eligible for another disciplinary probation for three years. Shortly after completing probation, Krieger received a written warning from her new supervisor, Dan Gold, for

violating Lilly's GPP Policy and poor performance, including tardiness and compliance with respect to a field visit, and failing to update Performance Management documentation as instructed. Lilly contends that Krieger was ultimately terminated after failing to demonstrate skill and proficiencies with respect to a new Lilly product when she did not pass a required test about the product and exhibited poor detailing at a divisional meeting.

As Lilly offered a legitimate cause for dismissal, the burden returns to Krieger. "While [Krieger] need not provide additional evidence to rebut an employer's proffered reasons for an adverse employment action, evidence previously used to establish a prima facie case must be sufficient to satisfy the 'more stringent question of whether the evidence is sufficient to establish pretext, rather than whether the evidence is sufficient to establish an inference of discrimination." Boice v. Southeastern Pennsylvania Transp. Authority, No. 05-4772, 2007 WL 2916188, at *12 (E.D. Pa. Oct. 5, 2007)(citation omitted). Establishing pretext requires more than "simple identification of an act or event that plaintiff believes bespeaks discrimination." Krieger must present evidence that either: "(1) casts doubt upon each of the reasons offered by Lilly for the employment action so that a fact-finder could reasonably conclude that each was a fabrication; or (2) allows the fact-finder to infer that discrimination was more likely than not the cause for the employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

Krieger attempts to prove that Lilly's stated reasons for its adverse decisions are unworthy of credence by simply reciting the same allegations of discriminatory conduct by Lilly and Rowland against her and members within her protected class. Having determined that this evidence is barely sufficient, it not insufficient, to make out a prima

16

facie case, such evidence most certainly will not meet the more stringent pretext prong. As already noted, Krieger's bare assertions regarding the treatment of other individuals will not survive summary judgment where there is no corroborating evidence. Additionally, Krieger's attempt to prove that Gold's termination decision was discriminatory by pointing to Rowland's discriminatory conduct is unavailing, as statements even by decisionmakers cannot constitute evidence if there is no evidence somehow linking that person to the actual employment decision.  See Jones v. School Dist., 19 F. Supp. 2d 414, 420 (E.D. Pa. 1998).  Consequently, Plaintiff could not make out a claim of disparate treatment against Lilly and, therefore, summary judgment in Lilly's favor is appropriate.

**C.     Retaliation**

Krieger claims that Lilly retaliated against her after making a complaint to HR and filing a charge of discrimination with the EEOC.    To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  Moore v. City of Phila., 461 F.3d 331, 339 (3d Cir. 2006). If Plaintiff establishes a prima facie case of retaliation, then the McDonnell Douglas burden-shifting analysis applies, in which Defendant must show a legitimate, non-retaliatory reason for its conduct. Id. at 342.  If Defendant makes this showing, Plaintiff must then demonstrate that the "employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.  Id.

Even assuming arguendo that Krieger is able to make out a prima facie case of

17

retaliation, she does not adduce sufficient evidence to prevail at the pretext stage. As noted above, Lilly's stated reason for placing Krieger on probation and terminating her employment are facially valid. To be sure, Krieger admits to the very misconduct and poor performance that formed the basis of her discipline and discharge. For example, Krieger admits to being late for numerous meetings, violating Lilly policy when adjusting her computer clock for entry purposes, entering missing sample cards late, and not passing a required test. Krieger attempts to show pretext by alleging that other individuals were not disciplined for submitting late sample cards. However, she still fails to support conclusory allegations with corroborating evidence. Again, bare assertions or suspicions of discriminatory conduct are insufficient to defeat a motion for summary judgment. Accordingly, summary judgment in favor of Lilly is appropriate.

### D.     Disability Discrimination

Plaintiff alleges that she was discriminated against "on the basis of disability and perceived disability, specifically as a nursing mother and care giver to a sick child." (Pl.'s Compl., --). However, the record indicates that Plaintiff did not intend or is now unwilling to pursue such a claim.[6] Because Plaintiff's abandonment of her disability claim constitutes waiver, summary judgment with respect to this claim is granted. See Seals v. City of Lancaster, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (failure to mention portions of defendant's argument in summary judgment response constituted abandonment of plaintiff's claims); Bennett v. Knauer, 528 F. Supp. 2d 571, 572 n.1 (E.D. Pa. 2007) (claimed deemed withdrawn due to plaintiff's failure to address it in

---

[6] Plaintiff admitted in response to Defendant's request for admission that she (1) is not asserting any claims in this action based on an alleged disability, an alleged record of disability, or anyone's alleged perception of her as disabled; (2) was not a nursing mother while she was employed by Defendant and supervised by Rowland; and (3) was not a caregiver to a sick child while she was employed by Defendant and supervised by Rowland. (Def.'s Ex. E)

response to defendant's summary judgment motion).

**E.     Breach of Contract**

Krieger claims that Lilly failed to follow its own written policies and procedures in responding to complaints of harassment and discrimination, and that such failure amounts to a breach of contract. Under New Jersey law, the employment-at-will doctrine provides that "an employer may fire an employee for good reason, bad reason, or no reason at all" unless prohibited by law or public policy. Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 643 A.2d 546, 552 (1994); *see also* Silvestri v. Optus Software, Inc., 175 N.J. 113, 814 A.2d 602, 607 (2003). Either party may terminate an employment relationship at will unless an agreement exists between the parties that provides otherwise. Varrallo v. Hammond Inc., 94 F.3d 842, 845 (3d Cir.1996) (applying New Jersey law). In certain circumstances, a company's employment manual contractually can bind the company notwithstanding its inclusion of a disclaimer of a creation of enforceable rights. Geldreich v. Am. Cyanamid Co., 299 N.J.Super. 478, 691 A.2d 423, 426 (1997). In order not to create a binding obligation on the company, the language in the manual "must be such that no one could reasonably have thought it was intended to create legally binding obligations." Id. at 427.

Here, Krieger relies on generalized anti-discrimination language in Lily's "Red Book," a document that summarizes the employer's employment policies. The Red Book merely states that the workplace is expected to be free of improper conduct, harassment, and other forms of discrimination. Nowhere in the language of the Red Book could one reasonably conclude that the provisions Krieger points to were intended to create a legally binding obligation beyond the anti-discrimination laws already in place.

Accordingly, this type of language in an employee handbook cannot be the predicate for a breach of contract claim and, therefore, summary judgment in favor of Lilly is appropriate. See Monaco v. American General Assur. Co., 359 F.3d 296, 308-09 (3d Cir. 2004) (rejecting plaintiff's attempt breach of contract claim where the employer's statement merely sets forth its desire to comply with its legal obligations and nothing more).

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted. An appropriate order follows.