**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARGARET TOURTELLOTTE, et al.,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| | : | **NO. 09-0774** |
| **ELI LILLY AND COMPANY, et al.,** | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

**OPINION**

Presently before the Court is Defendant Eli Lilly's Renewed Motion for Summary

Judgment as to all claims by Plaintiff Margaret P. Tourtellotte (Doc. 97); Plaintiff

Margaret P. Tourtellotte's Response in Opposition thereto (Doc. 104); Defendant Eli

Lilly's Reply in Support of its Renewed Motion for Summary Judgment (Doc. 113); and

Plaintiff Margaret P. Tourtellotte's Surreply (Doc. 115).  Upon consideration of the

parties' motions with briefs, and for the reasons set forth below, Defendant's motion will

be granted.

**I.    FACTUAL BACKGROUND**

Plaintiff Margaret P. Tourtellotte ("Plaintiff") was hired by Defendant Eli Lilly

("Defendant" or "Lilly") in March 2004 as a specialty sales representative in Defendant's

Neuroscience sales organization.  Plaintiff's sales partner was Brendan Whalen and her

first supervisor was District Manager Chris Hudson.  While working under Mr. Hudson,

Plaintiff stated that he considered her a "solid soldier" for the company and Plaintiff

received an award based on her sales performance. (Timothy Rowland's Deposition,

113:1-6)  In 2006, Plaintiff asked for and received maternity leave from approximately

mid-August 2006 to mid-December 2006 for the birth of her first son.  Following her

return from maternity leave in January 2007, Timothy Rowland ("Rowland") replaced Mr. Hudson as Plaintiff's supervisor.

Plaintiff first met Rowland at a district meeting in Malvern, Pennsylvania in January 2007. Plaintiff informed Rowland that she needed to bring her newborn son to the meeting and leave intermittently to nurse him, which Rowland expressed no problem with. During this district meeting, Rowland told the team he majored in home economics in college because he loved being around women. Rowland also made a comment about "all the female Barbie dolls that are now in the pharmaceutical industry." (Pl.'s Ex. A at 368:7-19) Furthermore, Plaintiff alleges that during an exercise where employees were pulling numbers from a hat, Rowland approached Plaintiff and another female employee and said "let's let the pretty girls go first." (Id. at 253:9-19)

In January 2007, Plaintiff had an annual merit pay raise meeting with Rowland. Plaintiff alleges that during this meeting Rowland referred to her as the "pretty redheaded Lilly rep" and suggested that Plaintiff have a conversation with her husband that Plaintiff would stay home and watch the kids while Plaintiff's husband worked. (Id. A at 247:21-23, 272:5-15)

In February 2007, Plaintiff attended a regional meeting in Atlanta, Georgia and received permission to bring her son and her mother, as a caregiver, and to receive reimbursement for expenses related to bringing her mother. Despite the fact Plaintiff was told by Rowland that she would be allowed to leave certain meetings or functions to nurse her son at her hotel room, she experienced problems when she made these requests and Rowland often forced her to wait to leave. Plaintiff further claims that while working in a group with two male coworkers, Rowland approached her and said, "you could be

2

ditsy-witsy Maggie, or you could be professional Maggie." (Id. at 251:6-9)  Plaintiff also

alleges that Rowland gave her difficulty with her reimbursement requests, but that

eventually she was reimbursed for her child care expenses.  Id. at 9-10.

In March 2007, during a meeting attended by Plaintiff, Rowland stated that he had

conversations with his wife about "suckling on the breast of corporate America" and

gestured towards Plaintiff and another nursing mother who periodically left meetings to

breastfeed their children.  (Id. at 178:6-9).

In April 2007, Plaintiff's son became sick and she requested time off to care for

him.  Plaintiff states that despite Defendant's program which provides time off to care for

sick family members, Rowland attempted to force Plaintiff to take vacation days for this

time.  After Plaintiff's time off was approved under Defendant's program, Plaintiff

claims Rowland called her while she was at home taking care of her son and demanded

that she submit a report, which Plaintiff claims had no imminent deadline.

On May 3, 2007, Plaintiff had a field visit with Rowland, where together they met

with a customer.  Plaintiff alleges that during this trip a disagreement between her and

Rowland arose over sales strategy and Plaintiff and her partner's sales numbers.  The

discussion between the two ended with Rowland telling Plaintiff to go home and speak

with her husband to decide if she wanted to continue working as a sales representative.

Following the May field visit, Plaintiff made a complaint to Defendant's Human

Resources ("HR") about Rowland's conduct.  Plaintiff informed HR representative, Julia

Dunlap, that she believed Rowland was mistreating her because she had requested

reimbursement for child care expenses and that she had taken time off in April to care for

her sick child.  Ms. Dunlap told Plaintiff that an investigation would occur and relayed

Plaintiff's concerns to HR representative Matt Morgan for investigation.  Plaintiff was never informed of whether the investigation occurred, and to what extent.  After contacting HR, Plaintiff spoke to another Lilly employee about her grievance and learned that other female employees had similar complaints regarding Rowland's behavior.

On May 18, 2007, Plaintiff sought and was granted medical leave of absence until June 14, 2007 due to extreme stress and anxiety.  Plaintiff states she began to experience problems at home and started seeing Dr. John Waldron as a result of her interactions with Rowland.  While on leave, Plaintiff submitted documentation from her doctor requesting that she return to work on January 1, 2008.  Defendant approved her leave to August 21, 2007 and informed Plaintiff that it was unlikely that further extensions would be granted.  Plaintiff requested another extension for leave, but it was denied.  Plaintiff reported to work in September 2007.

When Plaintiff returned to work she was placed on medical reassignment since her position was filled.  Consequently, Plaintiff was given sixteen (16) weeks of paid time during which her primary responsibility was to find a new position within the company.  Plaintiff requested to be reassigned to a position where she would not have contact with Rowland.  Defendant told her that they could not guarantee that she would never come in contact with Rowland, but identified positions within the company that were outside of Rowland's chain of command.  After Plaintiff failed to apply for or secure a new position in the company within the sixteen (16) week time period, she was terminated in January 2008.

II.    **STANDARD OF REVIEW**

Summary judgment is appropriate if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  See Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  Under Rule 56(e), the opponent must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most

favorable to the non-movant.  See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001)

## III.  DISCUSSION

### A.  Breach of Contract

New Jersey law provides that an employee manual may form the basis for a contract between an employer and employee.  Woolley v. Hoffman-LaRoche, Inc., 99 N.J. 284, 297-98, 491 AA.2d 1257, *modified* 101 N.J. 10, 499 A.2d 515 (1985).  A plaintiff asserting a breach of contract claim based on an employer's manual must identify some provision or language in the policy guaranteeing the benefit that was allegedly denied.  Bell v. KA Indus. Servs., LLC, 567 F. Supp. 2d 701, 710 (D. N.J. 2008).  However, New Jersey law "does not provide a separate breach of contract cause of action on the basis of generalized anti-discrimination language in an employee handbook where the alleged discrimination would be in violation of the NJLAD." Monaco v. American General Assur. Co., 359 F.3d 296, 309 (3d Cir. 2004).

Viewed in the light most favorable to the Plaintiff, Plaintiff has not presented sufficient evidence to present a genuine issue of material fact to support her breach of contract claim.  Plaintiff alleges that Defendant failed to properly follow its own policies and procedures in responding to complaints of harassment and discrimination.  Plaintiff made complaints about sexual harassment, harassment regarding the Nursing Mothers Program, and harassment for availing herself of the family leave policies of Defendant. Plaintiff states that although Rowland was investigated by human resources, he was exonerated from any wrongdoing.

In <u>Monaco</u>, the plaintiff, who was alleging age discrimination, attempted to assert a breach of contract claim by relying on an employee handbook which provided that the company would comply with all applicable laws regarding equal employment opportunities relating to age. 359 F.3d at 308. The Court found that this language did not create a legally binding contract because the statement merely demonstrated that the employer endeavored to comply with its legal obligations and nothing more. <u>Id</u>. The Court stated that if they were to agree with the plaintiff that the quoted provision of the employee handbook could be the predicate for a breach of contract claim, then "individuals bringing employment discrimination cases in New Jersey where an employment manual contained such a provision could as a matter of course assert both statutory discrimination and breach of contract claims based on the employer's same underlying conduct." <u>Id</u>. at 308-09. Therefore, the Court held that a breach of contract claim could not be based on generalized anti-discrimination language in an employee handbook because it would "add nothing to the statutory cause of action." <u>Id</u>. at 309.

In this case, Plaintiff similarly relies on generalized anti-discrimination language in the Red Book. The Red Book merely states that the workplace is expected to be free of improper conduct, harassment, and other forms of discrimination. Nowhere in the language of the Red Book could one reasonably conclude that the provisions Plaintiff points to were intended to create a legally binding obligation beyond the anti-discrimination laws already in place. As the Third Circuit laid out in <u>Monaco</u>, this type of language in an employee handbook cannot be the predicate for a breach of contract claim and therefore, Plaintiff's claim fails.

Plaintiff's breach of contract claim based on the assertion that Defendant failed to pay her childcare expenses under the Nursing Mothers Program in violation of the Red Book also fails.  Defendant stated that Plaintiff improperly filled out the required forms when she first requested reimbursement and after she submitted proper forms, all of her expenses were reimbursed.  In her response, Plaintiff does not dispute the fact that she was reimbursed for her childcare expenses; therefore, no breach occurred.

Based on the foregoing reasons, Defendants' motion for summary judgment as to Plaintiff's breach of contract claim is granted and Plaintiff's claim is dismissed.

**B.  Disability Discrimination**

### 1.  Disparate Treatment

New Jersey courts have traditionally sought guidance from the substantive and procedural standards established under federal law to prove disparate treatment under the NJLAD.  Viscik v. Fowler Equipment Co., 173 N.J. 1, 13-14, 800 A.2d, 826, 833 (2002).  Specifically, New Jersey courts have adopted the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed.2d 668 (1973).  Id.  Under that framework, a plaintiff must first prove a *prima facie case* case of discrimination on the basis of disability.  Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492, 446 A.2d 486 (1982).  To do so, a plaintiff must show that: (1) she is disabled or perceived to have a disability; (2) she was otherwise qualified to perform the essential functions of the job, with or without a reasonable accommodation by the employer; (3) she was fired; and (4) the employer sought someone else to perform the same work, or did fill the position with a similarly-qualified person.  Id.  The establishment of a *prima facie case* case gives rise to a presumption of discrimination. Id. at 493, 446 A.2d 486.

Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id.  After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination.  Id.  To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent.  Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 561, 569 A.2d 793 (1990) (holding that an "employee can be fired for a false cause or no cause at all. That firing may be unfair, but it is not illegal").  Thus, under the McDonnell Douglas framework, a plaintiff retains the ultimate burden of persuasion at all times; only the burden of production shifts.  Andersen, 89 N.J. at 493, 446 A.2d 486.

Pursuant to N.J.S.A. 10:5-5(q), there are two separate categories of handicaps: physical and non-physical.  Viscik, 173 N.J. at 15, 800 A.2d 826.  Plaintiff alleges that her disability claim is premised on the fact that she suffered psychological illness as a result of Rowland's conduct; and therefore, her alleged handicap falls under the NJLAD's nonphysical standard.  Viscik, 173 N.J. at 15-16, 800 A.2d 826.  To meet this standard, Plaintiff must prove that she suffered "(1) from any mental psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.  Id. at 16, 800 A.2d 826.

The term "handicapped" in NJLAD is not restricted to "severe" or "immutable" disabilities and has been interpreted as significantly broader than the analogous provision of the ADA.  Failla v. City of Passaic, 146 F.3d 149, 154 (3d Cir. 1998) (noting that LAD provides a lower standard than ADA because "the LAD definition of 'handicapped' does not incorporate the requirement that the condition result in a substantial limitation on a major life activity").  Where the existence of a handicap is not readily apparent, expert medical evidence is required.  Viscik, 173 N.J. at 16, 800 A.2d at 835.  Accordingly, courts place a high premium on the use and strength of objective medical testimony in proving specific elements of each test contained in the statute.  Id.  Additionally, under New Jersey law, there are two distinct categories of disability discrimination claims: (1) disparate treatment discrimination and (2) failure to accommodate.  Id. at 11, 831.

With regard to Plaintiff's alleged psychological disorders, the Court finds that Plaintiff has presented enough facts to establish that she is disabled under the NJLAD.  In Tynan v. Vicinage 13 of Superior Court, the plaintiff alleged that she suffered from post-traumatic stress disorder, depression, and panic attacks as a result of interactions with her supervisor.  351 N.J. Super. 385, 399, 789 A.2d 648, 656 (2002).  The Court found that she had set forth "sufficient illnesses and psychological maladies" to withstand a summary judgment motion.  Id.  In the present case, Plaintiff states that her physician, Dr. James Holton, diagnosed her with adjustment disorder with anxious and depressed mood with gastrointestinal problems caused by irritable bowel syndrome.  Plaintiff claims that both she and her doctor believe the psychological illness is a direct result of Rowland's conduct.  The Court finds that Plaintiff appears to have a cognizable disability upon which to base her discrimination claim at the summary judgment stage.

However, Plaintiff's disparate treatment claim fails for other reasons.  In her complaint, Plaintiff's disparate treatment claim is based on the allegation that Defendant discriminated against her as a nursing mother and caregiver to a sick child.  (Pl.'s Compl. at ¶ 143)  But Plaintiff states in her response to Defendant's Renewed Motion for Summary Judgment that her disparate treatment claim is no longer premised on the fact that she attempted to use Defendant's Nursing Mother Program and fails to respond to Defendant's arguments regarding this claim.  (Pl.'s Resp. at p.38)  Accordingly, Plaintiff's abandonment of this claim constitutes waiver, and summary judgment is granted in the Defendant's favor.  See Seals v. City of Lancaster, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (failure to mention portions of defendant's argument in summary judgment response constituted abandonment of plaintiff's claims); Bennett v. Knauer, 528 F. Supp. 2d 571, 572 n.1 (E.D. Pa. 2007) (claimed deemed withdrawn due to plaintiff's failure to address it in response to defendant's summary judgment motion).

### 2.   *Failure to Accommodate*

The EEOC's interpretative guidelines state that once a qualified employee "has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine an appropriate accommodation through an interactive process that involves both the employer and the employee.  Jones v. United Parcel Service, 214 F.3d 402, 407 (3d Cir. 2000).

To establish a *prima facie case* case "that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the

employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-20 (3d Cir.1999). "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." Id. at 317.

It is undisputed that Defendant knew about Plaintiff's disability due to the fact that Plaintiff requested and received medical leave based on her psychological illness. Additionally, Plaintiff did request an accommodation in that she asked to be placed in a position where she would have no contact with Rowland at all.  With regard to whether Defendant made a good faith effort to assist Plaintiff in seeking accommodations, the Court finds that Defendant properly engaged in an interactive process so as to satisfy its requirement. The EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." Taylor, 184 F.3d at 311 (citing 29 C.F.R. Pt. 1630, App. § 1630.9 at 359).

When Plaintiff returned to work on medical reassignment status, she had sixteen weeks to find a new position within the company.  Based on Plaintiff's past interactions with Rowland and its impact on her health, she wanted to be reassigned to a position

where she would have no contact with him.  While Defendant admits that it could not completely shield Plaintiff from any contact with Rowland, the company identified specific positions outside of Rowland's chain of command for Plaintiff to consider.  Yet, Plaintiff failed to apply for a single position during this period.  By giving Plaintiff a sufficient amount of time to search for and find a new position where she could work under a different supervisor, Defendant made a good faith effort to engage in an interactive process with Plaintiff.  The interactive process is meant to be a flexible interaction between *both* the employer and the employee.  However, Plaintiff did not participate in any way, she simply made demands about what she wanted and refused to act once her demands were not met, as evidenced by her failure to apply for a position.  Additionally, Plaintiff has not presented any evidence to suggest that Defendant could in fact guarantee that she would never come in contact with Rowland in a new position, much less that it could have been done without an undue burden.

Based on the foregoing reasons, Defendants' motion for summary judgment as to Plaintiff's failure to accommodate claim is granted.

### C.  Sex Discrimination

The discrimination inquiry under New Jersey law proceeds in three stages and is borrowed from the federal standard.  <u>Armstrong v. Burdette Tomlin Memorial Hosp.</u>, 438 F.3d 240, 249 (2006).  A plaintiff relying on circumstantial evidence for her discrimination claim must satisfy the test established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  First, the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie case* case of discrimination.  <u>Matckzak v. Frankford Candy & Chocolate Co.</u>, 136 F.3d 933, 939 (3d Cir. 1997).  If the

Plaintiff succeeds in proving the *prima facie case* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action.  Id. Finally, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Id.

To establish a prima facie case case of race or sex discrimination, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination.  Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).   An adverse employment action is one that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.  Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  An adverse employment action must be material.  Schmidt v. Montgomery Kone, Inc., 69 F. Supp. 2d 706, 713 (E.D. Pa. 1999) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1301 (3d Cir. 1997)).  Not everything that makes an employee unhappy is an actionable adverse action.  Young v. St. James Mgmt., LLC, 749 F. Supp. 2d 281, 289 (E.D. Pa. 2010).  Additionally, an adverse employment action may give rise to an inference of discrimination when a similarly situated employee who is not within the protected class is treated more favorably.  See, e.g., Jones v. Sch Dist. Of Phila., 198 F.3d 403, 413 (3d Cir. 1999).

Defendant contends that Plaintiff cannot make out a prima facie case case of sex discrimination because she fails to present evidence that she suffered an adverse

employment action that gives rise to an inference of discrimination.  Specifically, Defendant argues that Plaintiff's discrimination claim is premised on trivial actions that merely made her unhappy, such as Rowland's comments regarding breastfeeding, her appearance, her consulting her husband about her commitment to her job, and her male partner receiving better evaluations.  According to the Defendant, none of these actions were serious enough to change the terms and conditions of Plaintiff's employment with the company; and, more important, the company's decision was not made under circumstances giving rise to an inference of discrimination.

Plaintiff disputes the defendant's assertion, arguing that her discrimination claim is based on her ultimate discharge from the company.  Plaintiff further contends that the company's decision to terminate her employment was made under circumstances giving rise to an inference of discrimination.  According to Plaintiff, the defendant's discriminatory motive may be inferred from the fact that similarly-situate males at Lilly were treated more favorably, particularly her partner, Brendan Whalen.  Plaintiff alleges that Rowland humiliated her in front of her male colleagues when asking, "you could be ditsy-witsy Maggie, or you could be professional Maggie;"  required that she complete tasks that were not expected of Brad; and gave Brad a better evaluation than her, despite the fact that the sales numbers for partners are the same.  Plaintiff also alleges that Brad and another male employee (Derek Bobo) told her that Rowland had never spoke to them in the same hostile tone that he spoke to her.  Plaintiff also points to incidents experienced by other female employees, including co-plaintiffs in the present action, to support her claim of discrimination on the basis of sex.

Here, Plaintiff fails to make out a prima facie case of discrimination because she

fails to satisfy the "inference of discrimination" element.  Certainly, Defendant's decision to terminate Plaintiff constitutes a material change to the terms and conditions of her employment.  But that alone is insufficient.  Plaintiff must also show that Defendant acted with discriminatory intent, as established by direct and circumstantial evidence. While Plaintiff points to Rowland's favorable treatment of her male sales partner, disparaging remarks, and dismissive encounters with other female employees, these allegations do not relate to the employment action at issue, which is Plaintiff's discharge. While the Court acknowledges that treatment of "similarly-situated individuals" is not the only way to prove discriminatory motive, Plaintiff still fails to point to sufficient evidence that would permit a jury to find that her termination was motivated by a discriminatory purpose.

While out on paid leave of absence, Plaintiff's position was back-filled due to business needs.  Upon her return to work, she was placed on medical reassignment in accordance with Defendant's Medical Reassignment Policy and was given 16 weeks to find a new position within the company.  Despite Defendant's efforts in assisting Plaintiff with applying for ideal positions, Plaintiff chose to not apply for a single position and was therefore terminated at the end of the reassignment term.  Plaintiff does not allege that Rowland had anything to do with her being placed on medical reassignment, or that he had anything to do with Defendant's decision to ultimately terminate her.  Moreover, Plaintiff has not presented any evidence suggesting that similarly-situated individuals were treated differently under the medical reassignment program.  Without evidence adducing any of the foregoing conduct, the Court finds it difficult to hold that a reasonable juror could infer that Defendant discriminated against Plaintiff on the basis of

sex.    Accordingly, summary judgment in favor of Defendant is appropriate.

### D.  Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  Moore v. City of Phila., 461 F.3d 331, 339 (3d Cir. 2006).  A plaintiff claiming retaliation under Title VII "must show that a reasonable employee would have found the alleged retaliatory actions materially adverse in that they well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). If Plaintiff establishes a prima facie case of retaliation, then the McDonnell Douglas burden-shifting analysis applies, in which Defendant must show a legitimate, non-retaliatory reason for its conduct. Id. at 342. If Defendant makes this showing, Plaintiff must then demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.  Id.

Plaintiff fails to establish a prima facie case of retaliation because she does not show a causal connection between her grievance and discipline.  In deciding whether the plaintiff has shown causation, the Third Circuit "tend[s] to focus on two factors: (1) the 'temporal proximity' between the protected activity and the alleged discrimination and (2) the existence of 'a pattern of antagonism in the intervening period." Jensen v. Potter, 435 F.3d 444, 450 (3d Cir. 2006)(citation omitted).  "Although 'mere passage of time is not legally conclusive proof against retaliation,' [the Third Circuit] has indicated that the

passage of an extended period of time between the protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir 2000) (citation omitted).

Here, Plaintiff attempts to draw a causal link between her complaint to Human Resources and her ultimate termination by pointing to Defendant's decision to fill her position while she was out on leave and place her on medical reassignment.  However, Plaintiff does not dispute that Defendant's decision to fill her position was based on business need or that placing her on medical reassignment was inconsistent with business practice.  More important, Plaintiff presents no evidence suggesting that she was treated any differently than any other Lilly employee subjected to Defendant's Medical Reassignment Policy.  While Plaintiff suggests that Defendant placed her on medical reassignment in order to ultimately fire her, the record indicates otherwise.  Upon returning to work under medical reassignment, Plaintiff was given 16 weeks to secure another job within the company.  To assist Plaintiff in her search, Human Resources identified equivalent opportunities for Plaintiff, including open positions outside of Rowland's chain of command.  Despite Defendant's efforts in identifying positions that reasonably accommodated her requests, Plaintiff chose to not apply for a single position within the company.  Consequently, Plaintiff was terminated at the end of the 16-week period.  Based on the foregoing facts, the Court is not persuaded that Plaintiff has presented sufficient evidence to raise a question of material fact as to whether Defendant treated her adversely for complaining about Rowland's behavior.

Even assuming arguendo that Plaintiff made out a prima facie case, Plaintiff does

not present sufficient evidence to establish that Defendant's legitimate, non-discriminatory reason for termination is pretextual.  Defendant contends that, consistent with normal business practice, Plaintiff was placed on medical reassignment and given 16 weeks to find a new position within the company.  Plaintiff's bare assertion that Defendant's decision to fill her position and place her on medical reassignment was made to put her in a situation where she was destined to be terminated is not supported by facts to show pretext or an improper motive for her termination.  See Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981) ("[A] party resisting a motion cannot expect to rely on bare assertions, conclusory allegations or suspicions.")

### E.  Hostile Work Environment

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  To succeed on a hostile work environment claim, the plaintiff must establish that: 1) she suffered intentional discrimination because of her membership in a protected class; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected her; 4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and 5) there is a basis for holding the employer vicariously liable.  Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100,104 (3d Cir. 2009).  ).  A court should consider all the circumstances in determining whether an environment is hostile or abusive, including the "frequency of the discriminatory conduct, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

Courts may not impose Title VII as a civility code of the workplace. See Faragher v. City of Baco Raton, 524 U.S. 775, 788 (1998) (the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code'")(citation omitted).   Title VII is not violated by "[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe and pervasive as to constitute an objective change in the conditions of employment.  Id. (citation omitted).  Accordingly, occasional insults, teasing, or episodic instances of ridicule are not severe enough to permeate the workplace and change the very nature of the plaintiff's employment.  In examining a hostile work environment claim, the court should "consider the totality of the circumstance, rather than parse out the individual incidents, to determine whether the acts that collectively form the continuing violation are severe and pervasive." Mandel v. M&Q Packaging Corp., 2013 U.S. App. LEXIS 864, at *21 (3d Cir. Jan. 14, 2013).

Plaintiff claims that she was subjected to a hostile work environment because she is woman.  In support of her claim, Plaintiff alleges the following acts: Rowland's comment about loving to be around women; Rowland referring to female employees as "pretty girls" and "Barbie dolls;" Rowland referring to Plaintiff as the "pretty little redhead Lilly rep" and asking her if she wanted to role play "ditsy-witsy Maggie or professional Maggie;" Rowland's statement about suckling the corporate breast" while pointing to Plaintiff and another breastfeeding mother; Rowland's suggestion that Plaintiff speak with her husband about being a stay-at-home mother; and Rowland's comment to co-plaintiff Ana Reyes about Plaintiff not being a successful sales representative because of her concern with being a mother.  Plaintiff also anchors her

claim on Rowland's alleged discriminatory conduct towards other female employees.

Assuming, for summary judgment purposes, that these actions occurred as Plaintiff alleges, the actions identified by her are not severe or pervasive enough to make out a hostile work environment claim.  In fact, Plaintiff's claim fails for the very same reasons that her co-plaintiff's hostile work environment claim fails.  First, Plaintiff's alleged conduct is not of a character "so objectively offensive as to alter the 'conditions' of the victim's employment."  Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998).  None of the acts individually even approach a "serious" level of offensiveness, and collectively they do not paint a picture of a hostile work environment permeated by a "steady barrage of opprobrious [discriminatory] comments."  Al-Salem v. Bucks County Water & Sewer Authority, No. 97-6843, 1999 U.S. Dist. LEXIS 3609, at * 15-16 (E.D. Pa. March 25, 1999).  While inexcusable and offensive, Rowland's comments were neither physically threatening nor humiliating and fall far short of the level required to establish the kind of severe, gender- or race-based, harassment that is legally actionable.  See Faragher, 524 U.S.  at 788 ("Conduct must be extreme to amount to a change in the terms and conditions of employment.").  "[D]iscourtesy or rudeness should not be confused with racial or [sexual] harassment," and "a lack of racial [or gender] sensitivity does not, alone, amount to actionable harassment."  Id. at 787 (citing 1 Barbara Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed. 1986)).

Second, this conduct was not pervasive or even very regular.  By the Court's calculation, Krieger points to approximately six interactions with Rowland over the course of five months, i.e.  January 2007 through May 2007.  Of these, only two were

individual field rides and the remaining were in-person interactions that took place in group settings with other sales representatives.  The approximate monthly frequency of these interactions, however much they bothered Plaintiff personally, appear to be sporadic, isolated incidents that did not unreasonably interfere with her ability to perform her job.  While Plaintiff may have taken issue with Rowland's conduct, no reasonable juror could conclude that the conduct was so severe or pervasive as to create a hostile work environment.  Accordingly, summary judgment in favor of Defendant is proper.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted. An appropriate order follows.